**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| MJI Family Investments, LLC, an Arizona limited liability company; Christopher B. Roop; David Chatt; Trio Seed Partners, L.P., a New York limited partnership; Duke Health System Ltd., LLC, an Ohio limited liability company; and Timothy Murphy, M.D.<br><br>          Plaintiffs,<br><br>v.<br><br>Gary M. Onik, M.D.; Eamonn P. Hobbs; and Joseph P. Gerardi,<br><br>          Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs MJI Family Investments, LLC, Christopher B. Roop, David Chatt, Trio Seed Partners, L.P., Duke Health System Ltd., LLC, and Timothy Murphy, M.D., by and through their undersigned counsel, file this Complaint against Defendants, Gary M. Onik, M.D, Eamonn P. Hobbs, and Joseph P. Gerardi, and allege as follows:

1.     These claims arise out of Defendants' unlawful solicitation of Plaintiffs to invest in ImmunSYS, Inc., a Delaware corporation (the "Company" or "ImmunSYS") in 2018, in 2019 and again in 2020 by (i) making, or causing to be made, false and misleading statements that the Company owned valuable intellectual property, including patents pending on medical inventions and processes and a proprietary drug formulation,  by which the Company was going to bring to market and profit from a supposedly novel treatment for end-stage metastatic prostate and other tumors, and (ii) by omitting, or causing to be omitted, additional facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading. Plaintiffs also committed fraud, engaged in a conspiracy to defraud, and negligently misrepresented the facts of the investment to Plaintiffs, all while acting as officers and/or directors of the Company.  Plaintiffs invested $1,428,714.22 as part of more than $7.6 million the Company

raised from outside investors in those years, only to see their entire investment lost when Defendants' fraud was revealed and the Company filed for bankruptcy protection on or about December 31, 2020. This action is brought under the securities laws of the United States and the State of Florida, as well as under Florida common law, for recovery of those losses.

## PARTIES

2.      Plaintiff MJI Family Investments, LLC ("MJI") is an Arizona limited liability company with its principal place of business in Phoenix, Arizona.

3.      Plaintiff Christopher Roop is a citizen of the state of New York.

4.      Plaintiff David Chatt is a citizen of the state of New York.

5.      Plaintiff Trio Seed Partners, L.P. ("Trio Seed") is a limited partnership organized and existing under the laws of the state of New York, with its principal place of business in that state.

6.      Plaintiff Duke Health System Ltd, LLC ("Duke") is an Ohio limited liability company with its principal place of business in that state.

7.      Plaintiff Timothy Murphy, M.D. ("Murphy") is a citizen of the state of Rhode Island.

8.      Defendant Gary M. Onik, M.D. ("Onik") is a citizen of the state of Florida, living in Ft. Lauderdale.

9.      Defendant Eamonn P. Hobbs ("Hobbs") is a citizen of the state of Florida, living in Ft. Lauderdale.

10.      Defendant Joseph G. Gerardi ("Gerardi") is a citizen of the state of Florida, living in Ft. Lauderdale.

## JURISDICTION

11.     Plaintiffs bring these claims for violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10B-5.

12.     Plaintiffs also bring these claims for violations of the Florida Securities and Investor Protection Act, Section 517.301, Florida Statutes, as well as for breach of fiduciary duty, fraudulent inducement, negligent misrepresentation, and conspiracy to defraud under Florida common law.

13.     This Court has exclusive federal jurisdiction of Count One of this Complaint pursuant to section 27 of the Securities Exchange Act, 15 U.S.C. §78aa, and under 28 U.S.C. §1331.  The court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367.

14.     Venue is proper in this district under 28 U.S.C. §1391, as each Defendant maintains a residence or place of business within this district, and/or each Defendant has caused events to occur in this district out of which these claims arise.

## MATERIAL FACTS

15.     The Company was incorporated under the laws of the state of Delaware on April 10, 2018.

16.     Defendant Onik is a medical doctor and researcher and one of the founders of the Company.  He was hired as the first chief medical officer of the Company in or about April 2018. He served in that capacity until mid-2019, and thereafter as a medical consultant to the Company to at least the end of 2020.

17.     Defendant Hobbs was hired as the first chief executive officer of the Company in April 2018.  He served in that capacity until September 2, 2020.

3

18.     Defendant Gerardi was hired as the first chief financial officer of the Company in April 2018.  He served in that capacity until August 21, 2020.

19.     Prior to joining ImmunSYS as officers, Defendants Hobbs and Gerardi had served as officers of AngioDynamics, Inc., a company that had a patent or patents on a proprietary form of radio frequency technology that was used for medical purposes, including ablation of tumor cell walls, as part of cancer treatments.

20.     According to information provided to investors as described below, the Company was formed to operate as a self-described "clinical stage biopharmaceutical company focused on the development of innovative cancer products to treat metastatic solid tumors."

21.     According to information provided to investors as described below, the Company's business plan was to exploit a supposedly proprietary medical technology, branded as "MyVaccx", to treat metastatic end-stage prostate tumors in patients whose tumors had resisted all other treatments.

22.     As described hereinafter, the Company represented to investors in 2018 that it owned technology that included an allegedly novel, proprietary medical device for tumor ablation referred to in patent applications as "radio frequency electrical membrane breakdown" ("RF-Emb"), as well as use of a proprietary formulation of pharmaceutical drugs, Ablatamab, along with a proprietary medical process, for the treatment of metastatic prostate cancer tumors.

23.     The technology the Company owned had been acquired by it from a company, RFEMB, LLC, in which Onik had an interest, in July 2018.  It included, *inter alia,* several patent applications pending in the United States Patent and Trademark Office.  Two of those applications described inventions for a (1) "System and Method for Radio-frequency Energy Electrical Membrane Breakdown for Tissue Ablation"; and a (2) "Cancer Immunotherapy By Radio-

Frequency Electrical Membrane Breakdown (RF-Emb)".  The Company also had a patent pending with the World Intellectual Property Organization for a drug formulation for the "Immunological Treatment of Cancer" that it called "Ablatamab".

24.     Both of the patent applications pending with the USPTO allegedly involved using radio frequency electrical mechanical membrane technology to disrupt cancer cell walls of solid tumors without destroying the cancer cell antigens contained in those cells, thereby exposing those cancer cell antigens to the patient's immune system.  Upon gaining access to the tumors by inserting a needle into them using medical imaging guidance, the Company's proposed treatment method involved injection of Ablatamab into the tumors to induce a robust immune response that would then attack cancer cells wherever they existed throughout the body.

25.     The inventors listed in the applications for those two pending radio frequency patents were Onik and his lawyer, James Miessau.  Both men owned interests, indirectly, in RFEMB.

26.     The inventors listed in the application for Ablatamab were Onik and another medical doctor, David Bostwick. Bostwick also owned an interest, indirectly, in RFEMB.

27.     Onik acquired a significant number of shares in the Company as part of the sale of the aforementioned technology from RFEMB to it.

28.     Other members of RFEMB, including Miessau and Bostwick, also acquired a significant number of shares in the Company as part of the sale of the aforementioned technology from RFEMB to it.

29.     Gerardi, acting for the Company signed an Exchange Agreement in July 2018 by which the Company acquired the intellectual property assets of RFEMB in exchange for approximately 80% of the Company's stock.

30.     In connection with the Company's purchase of the assets of RFEMB, Defendant Onik as Chief Medical Officer and a director of the Company, Defendant Hobbs, as CEO and a director of the Company, and Defendant Gerardi, as CFO of the Company each failed to obtain for the Company any representation or warranty from RFEMB concerning the novelty, enforceability or utility of the patents described in Schedule 1(e), or any representation that those inventions were not subject to challenge as a result of prior art.

31.     Onik developed the supposedly novel, proprietary and valuable technology that RFEMB sold to the Company. At  the time Onik sold or caused to be sold shares of the Company to RFEMB in exchange for that technology , he knew that the intellectual property RFEMB  sold to the Company had no value because (i) the pending  patent applications the Company had acquired involved inventions that were not essential to, nor did they confer any advantage in, the treatment of metastatic tumors, as other methods of ablation of tumor cell walls were in general use and were superior; (ii) Onik had in treating patients used other,  preferred methods of disrupting cancer cell walls as part of  his treatment of metastatic cancers rather than using RF-Emb ablation; (iii) Ablatamab, the supposedly patentable formulation of immunotherapeutic drugs the Company planned to use after ablation of tumor cell walls was not  proprietary to the Company, as the drugs the Company planned to use had been invented years before by unrelated persons and/or companies,  they were being marketed under the trade names Yervoy, Keptruda and Opdivo for cancer immunotherapeutic treatments, and they had been used in the same formulation by other medical practitioners to treat tumors; (iv) the method of treatment the Company was to employ was not proprietary, as it had been used by other researchers to treat patients with tumors before Onik started doing so, and Onik had in fact learned that methodology from others and had not invented it; and (v) radio frequency ablation had already proven to be inferior to cryo-ablation to

achieve the desired tumor membrane breakdown, and cryo-ablation was a method already in the public domain.

## The First Offering of Shares

32.    After causing the Company to acquire the intellectual property of RFEMB, Defendants caused the Company to make a $6 million private offering at $3.4569 a share of ImmunSYS shares in August 2018 to Plaintiffs and other "friends and family" investors.

33.    In connection with that first offering of shares, Defendants Hobbs and Gerardi prepared or caused to be prepared and provided to Plaintiffs a Private Offering Memorandum ("POM") to tout the alleged benefits of investing in the Company.

34.    Hobbs signed, as Chairman of the Board of Directors and CEO of the Company, a letter to Plaintiffs transmitting the POM where he stated that it was being provided to them so they could "assess the technology and investment opportunity."  Gerardi, as CFO of the Company, signed other such letters to Plaintiffs.

35.    The POM described clinical results allegedly obtained by Onik in treating metastatic prostate tumors.

36.    Onik provided imput into and reviewed the POM before the Company made it available to potential investors.

37.    The POM that Defendants disseminated or caused to be disseminated stated in bold on its cover that the Company was "SYSTEMATICALLY TRANSFORMING CANCER IMMUNOTHERAPY."

38.    Defendants stated, or caused to be stated in the POM, that the Company had a "pre-money valuation of $100 million" based on the supposedly proprietary and valuable technology that the Company would supposedly employ as part of its business.

39. The POM consisted, *inter alia*, of seven pages of printed material, a 36 page "Pitch Deck", and a blank Stock Purchase Agreement with attached schedules and exhibits.

40. In the Executive Summary in the POM, Defendants stated, or caused to be stated:

    a. COMPANY OVERVIEW. ImmunSYS is a clinical stage immunotherapeutic drug and device company focused on the development of a new late stage metastatic prostate cancer therapy called MyVaccx$^{TM}$

    b. HOW DOES MYVACCX$^{TM}$ WORK? My Vaccx$^{TM}$ is designed to empower the patient's own immune system to fight off cancer. It is designed to achieve this via a focal treatment of the solid tumor via a proprietary antigen presentation medical device system, immediately followed by the intra-tumoral injection of a proprietary immunotherapeutic drug formulation. The immune system then is expected to immediately create an autologous vaccine that attacks the cancer throughout the body.

    c. THE THERAPY INVOLVES 4 STEPS:

        1. Expose the cancer to the immune system
          o A proprietary medical device system (special needle) is utilized to disrupt the cancer cells in a primary tumor or a metastasis in a way that does not damage the complex protein structures that distinguish the cancer cells from normal, healthy tissue.

        2. Eliminate the cancer's ability to locally shut the immune system off
          o A proprietary immunotherapeutic drug formulation is administered through the same needle directly into the tumor to inhibit the cancer's ability to turn off the immune system locally.

        3. Immune system learns and creates vaccine

        4. "Turbo charge" the immune system
          o An immuno-stimulating cytokine is utilized to ramp up the immune system to fight the cancer throughout the body.

    d. EXCEPTIONAL RESULTS. The MyVaccx$^{TM}$ Phase 1 data is compelling in that the therapy has delivered a **35% complete response** rate in late stage metastatic prostate cancer patients. The complete responses have been durable, with the longest patient treated over 3 years ago and still disease-free. These results are even more impressive

considering that prostate cancers have not responded to any of the numerous published systematically administered immunotherapy studies completed to date.

e. The Phase 1 study included treatment of some additional adenocarcinomas which also produced a very positive signal; therefore, we believe that our antigen presentation and intra-tumoral injection technology is potentially a broad platform and a new "Operating System" for immunotherapy.

f. THE UNMET NEED.  Our initial focus will be late-stage prostate cancer, where there are currently no known therapies that provide more than a few months of overall median survival benefit.  Known prior attempts to utilize immunotherapy to treat prostate cancer have failed to the extent that prostate cancer has often been termed an "immunologic desert."

g. THE IMMUNSYS ANSWER.  Very late stage prostate cancer patients have exhausted all conventional treatments and run out of viable options to treat their disease.  They are typically referred to hospice care and told to settle their affairs as the remaining life expectancy is very short.

h. My Vaccx$^{TM}$ provides these patients with a new treatment option that potentially offers significant benefits, including the possibility for a durable complete response (remission).

41.    Defendants stated, or caused to be stated, in the POM that "the therapy [MyVaccx] features a strong patent portfolio with 8 pending patent applications in the U.S., including 1 with claims directed to allowable subject matter and 36 additional patent applications pending worldwide."

42.    The allegedly valuable intellectual property owned by the Company was listed on Schedule 3(h) of the blank Stock Purchase Agreement as "Registered Intellectual Property", an itemization of patent applications then pending.

43.    The Registered Intellectual Property list on Schedule 3(h) was among the intellectual property Onik had caused RFEMB to sell and the Company to purchase from RFEMB.

44.     In the context in which the statements in the POM were made, Defendants intended to represent, and did represent, to Plaintiffs that the Company's patents pending gave it a strong, unique, competitive advantage for end-stage metastatic prostate solid tumors.

45.     Defendants did not disclose, or cause the Company to disclose, to Plaintiffs in connection with the share offering in August 2018 that the Company had acquired RFEMB's intellectual property without doing any due diligence on, or obtaining warranties and representations concerning, the validity or utility of the patents pending that the Company had acquired, or the non-existence of prior art.

46.     The POM that Defendants prepared, or caused to be prepared, and approved for use in soliciting investments, lauded the clinical results Onik had supposedly obtained using MyVaccx as being "even more impressive considering that prostate cancers have not responded to any of the numerous published systemically administered immunotherapy studies completed to date….Known prior attempts to utilize immunotherapy to treat prostate cancer have failed to the extent that prostate cancer has often been termed an 'immunological desert'."

47.     Defendants falsely stated, or caused to be falsely stated, on page 14 of the Slide Deck in the POM that Onik, using an allegedly patented MyVaccx medical device, *i.e.,* a device to which the Company was seeking a patent, along with "proprietary drug formulations", had treated 17 terminal prostate cancer patients who had supposedly exhausted all other available treatments for their condition, achieving complete remission in six patients and partial response in eight others, for a better than 50% positive response rate.

48.     The Defendants referred in the POM to some of the proprietary technology the Company owned and as to which patents were pending as "Electrical Membrane Breakdown" ablation, or "RF-Emb."

49.     In fact, Onik had not used  RF-Emb technology to ablate any tumor cell walls when he treated the 17 prostate cancer patients whose treatment Defendants described  in the POM.

50.     In fact, the drug formulation Onik had used to treat the 17 metastatic prostate cancer patients whose treatment was discussed in the POM, Ablatamab, was a non-proprietary formulation of off-the-shelf immunotherapeutic drugs that was subject to prior art.

51.     In fact, the methodology Onik had used to treat the 17 patients whose treatment was discussed in the POM was not a unique or proprietary methodology that he had developed.  It was a methodology that he had learned from one or more other medical practitioners who had already used it to treat metastatic prostate tumors, not a technology he had invented.

52.      Hobbs knew as a result of a meeting he had with Onik in New York City in 2018, among other means, and Gerardi knew or should have known, that the patient results Onik described in the POM as having achieved were not achieved using any proprietary technology, much less RF-Emb technology.  Dr. Onik had treated all of the patients using a competing, nonproprietary cryosurgical ablation process, or a competing radio frequency ablation process, to gain access to tumors, both of which the Hobbs and Gerardi knew, or should have known from their work in a competing company, were in the public domain and not covered by the patents pending that the Company had purchased from RFEMB.

53.     Onik and Hobbs also knew, and Gerardi knew or should have known, that the patient results described in the POM had been achieved using a non-proprietary formulation of off-the-shelf immunotherapeutic drugs.

54.     Onik and Hobbs knew, and Gerardi knew or should have known, that Onik did not use a unique or proprietary methodology to treat the patients whose treatment was discussed in the POM.

55.     Onik knew, and Hobbs and Gerardi knew or should have known, that other clinicians, including Jason R. Williams, M.D., a board-certified radiologist, clinical researcher and Director of Interventional Oncology and Immunotherapy at the Williams Cancer Institute, had previously published results of clinical work on treatment of solid tumors, and Dr. Williams had taught his clinical procedure to Onik.

56.     Onik and Hobbs knew, and Gerardi knew or should have known, in August 2018 that the RF-Emb technology they touted in the POM for treatment of solid tumors had been superseded by superior cryosurgical ablation technology.   In fact, Onik had been using cryosurgical ablation procedures, rather than RF-Emb, to successfully treat some of his own patients for some time prior to August 2018.

57.     Defendants also falsely stated, or caused to be stated, in the POM that "No other physicians are known to be competing for these late-stage patients."   However, Onik knew, and Hobbs and Gerardi knew or should have known, that other physicians were treating patients with therapies consisting of electrical frequency or cryo-ablation techniques, followed by the same formulations of immunotherapeutic drugs.

58.     Each of the Defendants caused the Company to make the foregoing false representations and omissions in the POM either knowing them to be false or in reckless disregard of the truth or falsity of those statements when they had a duty to ascertain the true facts before soliciting investments from Plaintiffs.

59.     Alternatively, Defendants made, or caused to be made, the foregoing false statements negligently, and/or with wanton and willful disregard for the truth, not knowing whether the statements were true or false at the time they made them.

60.    Each of Plaintiffs relied on the false statements and omissions Defendants made or omitted, or caused to be made or omitted, in the POM in deciding to purchase securities of the Company.

61.    Plaintiffs paid the following sums to purchase shares in the Company in August 2018:  MJI ($150,001.21), Roop ($100,001.20), Trio Seed ($300,000.15), Duke ($475,002.26), and Murphy ($100,001.20).

62.    None of the Plaintiffs would have purchased shares in the Company had they known the true facts about the Company's intellectual property and/or the misrepresentations made about the results of Onik's treatment of patients.

## The Second Offering of Shares

63.    Between August 2018 and June 7, 2019 two additional directors joined the Company's Board.

64.    On June 7, 2019, three additional directors were added to the Company's Board.

65.    At a Company board meeting on June 7, 2019, Defendant Onik told the Board members who were present, including Hobbs, that cryo-ablation technology, for which the Company had no patent rights, was superior to the RF-Emb technology the Company had acquired from RFEMB and had touted in the POM.

66.    Onik recommended at the June 7, 2019 that the Company not further pursue a business plan based on the radio frequency patents.

67.    This June 7, 2019 Board discussion followed receipt by the Company of a letter from counsel for AngioDynamics, Inc., Hobbs and Gerardi's former employer, on May 8, 2019 warning that the Company's proposed use of RF-Emb technology to treat prostate tumors would infringe on one or more of that company's patents.

68.     Notwithstanding the May 2019 warning letter from AngioDynamics of patent infringement and June 2019 Board of Director's meeting discussion, including Onik's recommendation against using RF-Emb ablation without disclosure to Plaintiffs of any of those facts, Defendants solicited, or caused to be solicited, in June 2019 additional funds from Plaintiffs on behalf of the Company on the basis of the MyVaccx technology described in the POM.

69.     In this second private offering Defendants continued to falsely state, or cause to be stated, that the Company owned and was planning to exploit a novel, cutting edge, patentable medical technology, along with a proprietary formulation of immunotherapeutic drugs and a proprietary treatment methodology.

70.     Defendants did not disclose, or caused to be disclosed, to Plaintiffs that they had made false statements, or caused false statements to be made, or omitted to state material facts, or caused material facts to be omitted, in the POM in connection with the sale of securities in 2018.

71.     Defendants made no effort to correct the misstatements in and omissions from the POM before offering securities for sale to Plaintiffs in 2019.

72.     Each of the Defendants knew or should have known these statements to be false, and knew or should have known that material statements had been omitted from the POM at the time the POM was provided to Plaintiffs.

73.     Alternatively, Defendants made, or caused to be made, the foregoing false statements and omissions negligently, or negligently caused them to be made or omitted, not knowing whether they were true or complete and accurate at the time they made them.

74.     Defendants intended Plaintiffs to continue to rely on the POM in making their investment decisions in the Company 2019.

75. Defendants repeated their false statements and omissions to Plaintiff MJI, or caused them to be repeated, to induce it to invest again in the Company.

76. In continued reliance on Defendants' continuing false statements and omissions, Plaintiff MJI purchased $50,000 additional shares in the Company in mid-2019.

77. Plaintiff MJI would not have purchased shares in 2019 had MJI known the true facts.

## The Debt Offering

78. In the fall of 2019, the Company conducted animal studies that confirmed that cryosurgical ablation was a superior technology to RF-Emb ablation for gaining access to tumor cells to treat metastatic prostate cancer.

79. Defendants did not in 2019 reveal, or cause to be revealed, the results of these animal studies to Plaintiffs.

80. In or about October 2019, the Company retained the Fish & Richardson law firm to conduct a Freedom to Operate search for any prior art that could serve as a challenge to the MyVaccx system. Upon information and belief, that law firm advised the board and management of ImmunSYS in late 2019 or early 2020 that the Ablatamab patent rights RFEMB had sold to ImmunSYS in July 2018 in exchange for shares of the Company were likely unenforceable, being subject to prior art.

81. Nonetheless, in May 2020, Defendants, without disclosing, or causing to be disclosed, the foregoing developments or results of the Company's investigation, together with other material facts described below, caused the Company to make a debt offering to Plaintiffs to raise additional capital.

82.     In connection with that offering, Defendants continued to make, or cause to be made, the same false statements and omissions contained in the POM about the Company's pending patents and know-how, and its plan to exploit those assets to treat metastatic prostate tumors.

83.     Defendants did not disclose, or cause to be disclosed, to Plaintiffs prior to the May 2020 debt offering the warning letter the Company had received from AngioDynamics Inc. in May 2019.

84.     Defendants did not disclose, or cause to be disclosed, to Plaintiffs prior to the May 2020 debt offering that Defendant Onik had revealed to the board of directors in June 2019 that cryosurgical ablation was a superior medical procedure to RF-Emb ablation for treatment of tumors of the prostate gland, or Onik's recommendation that the Company abandon efforts to use RF-Emb.

85.     Defendants further did not disclose, or cause to be disclosed, to Plaintiffs prior to the May 2020 debt offering that ImmunSYS had conducted animal studies in the second half of 2019 that had confirmed that cryosurgical ablation was superior to RF-Emb ablation for the treatment of tumors.

86.     Defendants also did not disclose, or cause to be disclosed, to Plaintiffs prior to the May 2020 debt offering that they had made, or caused to be made, material misrepresentations in and omissions from the POM in connection with the 2018 and 2019 sale of securities to Plaintiffs and others.

87.      In May 2020, Gerardi, as CFO of the Company, provided to one of the Company's founding shareholders a set of Draft Financial Statements for the first quarter of 2020.  The Company's balance sheet showed it to have assets of only $363,597.91. It showed the Company

to have liabilities of $2,107,461.24, and total equity of minus $1,743,863.33.  Defendants did not disclose these facts, or cause them to be disclosed, to Plaintiffs before soliciting further investment from them.

88.     Defendants in May 2020 instead continued to state, or cause to be stated, to Plaintiffs that ImmunSYS had a viable business plan based on allegedly valuable RF-Emb technology, and a proprietary formulation of immunotherapeutic drugs, and they chose not to clarify or retract the false statements they had made to Plaintiffs in connection with their investments in 2018 and 2019.

89.     Defendants also falsely stated, or caused to be stated, that the Company would obtain third party funding in the fourth quarter of 2020 to continue its research, development and operations.

90.     Defendants intended Plaintiffs to continue to rely on these false representations and omissions in making addition investment decisions in 2020.

91.     Defendants' statements and omissions were material and were again false, and known by them to be false.

92.     Defendants' omissions were material in that Defendants failed to state, or caused the Company to fail to state, facts necessary to make the statements made, in the light of the circumstances in which they were made, not misleading.

93.     In reliance on Defendants' continuing misrepresentations, Plaintiffs purchased debt of the Company as follows:  Chatt ($103,707.00); MJI ($50,000.000); Trio Seed ($100,000.00).

94.     None of these Plaintiffs would have purchased the Company's debt had they known the true facts.

**The Fraud is Exposed**

95.     After Defendants had caused Plaintiffs to invest in sum more than $1.4 million in the Company, on or about July 9, 2020, members of the Board of Directors of the Company drafted and circulated amongst themselves, but not to Plaintiffs, a memorandum entitled Confidential Situation Analysis Update and Reorganization Plan that documented the fraud that had been perpetrated on Plaintiffs.  Among the facts and circumstances revealed in that memorandum are the following:

a.     "When ImmunSYS acquired the assets of RFEMB Holdings, LLC, the transaction was materially based on the premise that the RFEMB technology would offer significant advances over the cryosurgical equipment that Dr. Onik had been using in his practice. "

b.     "Chief Scientific Officer John Conda became aware that what we have named the YourVaccx method [sic] was first put into clinical use in 2014 and was published by Jason Williams, MD in February 2015, which was two months before Gary Onik, MD did his first case in April 2015".

c.     "It seems clear that it is no longer defensible to claim that the method was invented by Dr. Onik, when it in fact it was published by Dr. Williams before Dr. Onik clinically used it."

d.     The decision to use radio frequency EMB technology rather than non-proprietary cryosurgical technology was also "fatally flawed" because "the technology acquired from RFEMB, when tested performed far less effectively than off-the-shelf cryosurgical equipment."

e.      Dr. Onik "has continued to treat patients in his practice with off-the-shelf drugs and cryosurgical devices and continues to demonstrate compelling outcomes for patients."

f.      "David Bostwick, MD started his own company in 2018, Rampart Health, LLC and has a Phase II clinical trial underway in metastatic cancer prostate cancer patients using the same method of off-the-shelf drugs and cryosurgical equipment."

g.      "It is critical to understand that RFEMB Holdings, LLC in fact sold to its successor ImmunSYS, Inc. ZERO intellectual property and/or other defensive [sic] assets able to stop or even slow down anyone who develops the therapy method to compete with ImmunSYS."

h.      "ImmunSYS had for several months been actively raising money (which totaled approximately $7 million) from Friends and Family Investors at a pre-money valuation of $100 million based largely on the premise that REFEMB was a very valuable technology that would provide broad protection for the new therapy method."

i.      "Dr. Onik's data was generated using off-the-shelf drugs and devices, rather than proprietary ones."

96.      Neither the Confidential Situational Analysis and Reorganization Plan nor the contents of that document were provided by Defendants to Plaintiffs at the time.

97.      On or about July 23, 2020, the Company's Vice President of Device Development Daniel K. Recinella made a presentation to the board of directors of the Company in which he presented evidence that the Company had acquired no enforceable patents from RFEMB.

98.      Mr. Recinella's presentation and its conclusion were concealed from Plaintiffs.

99.     The Company's board of directors sent a Memorandum dated August 7, 2020 to several of the Company's founding shareholders, who had also been the members of RFEMB at the time of the sale of its intellectual property to the Company, that referred to "the Company's pointless acquisition of the RFEMB Property", and  noted that "the Company has been advised by patent counsel that based on extensive prior art, some of which has been published by Dr. Williams, and the obviousness of adding a GM-CSF to the injection, there is no chance that the Ablatamab patent application will ultimately result in any issued valuable claims for the Company."

100.    Defendants did not share this Memorandum with Plaintiffs, or cause it to be shared.

101.    By August 2020, Defendants had caused the Company to burn through almost all of the $7.648 million it had raised from Plaintiffs and others in the First and Second Share Offerings and the Debt Offering.

102.    In July and August 2020, the Company's Board of Directors began considering having the Company file for bankruptcy, as the Company had been unable to raise funds needed to continue in business on a revised "first to market" basis, which the Company was pursuing because the intellectual property it owned was essentially worthless.

103.    To prevent members of the Company's Board of Directors from revealing the fraud on Plaintiffs that would occur via a bankruptcy filing, on August 21, 2020 Defendant Onik, along with other founding shareholders who were collectively in control of the Company, voted to terminate the existing board members and imposed on the Company a new Board consisting of Onik and one new member.

104.    Onik's effort at concealment of the true circumstances of the Company failed, as the Company's financial situation continued to deteriorate, and, on or about December 31, 2020, the Company filed for bankruptcy in the Southern District of Florida.

105.    At the time the Company filed for bankruptcy protection, it had only $9,375.96 in its checking account, and no other tangible assets, other than its intellectual property.

106.    In contrast to the $100 million valuation Defendants had placed on the Company in 2018 largely, if not wholly, based on the supposedly valuable intellectual property the Company owned, the Company disclosed in its bankruptcy filing that, in its view, its intellectual property portfolio had a value of only $190,912.77.

107.    The Company filed a proposed plan to exit bankruptcy, and then amended that plan. Neither the plan nor the amended plan contemplated that the Company would make any use of the patent rights that RFEMB had sold to ImmunSYS in August 2018.  It would instead continue in business using the non-proprietary methodology Onik had been using prior to the filing.

108.    As a practical matter, although Plaintiffs were left with shares in the reorganized Company, those shares have been rendered valueless by Defendants' fraud.

109.    Plaintiffs are informed that Defendants Hobbs and Gerardi have formed a new company with Jason R Williams, M.D. to compete with the reorganized Company in the development and marketing of metastatic prostate cancer treatments using cryo-surgical technology and off-the-shelf cancer treatment formulations.

110.    Plaintiffs have each lost their entire investment in ImmunSYS as a direct and proximate cause of the wrongdoing of the Defendants that induced them to invest in the Company.

111.    Defendants' solicited Plaintiffs' investments in 2018, in 2019 and in 2020 by phone, by internet communication, and by mail.

## COUNT ONE

### Federal Securities Fraud Against
### Defendants Onik, Hobbs and Gerardi

112.    Plaintiffs incorporate by reference the allegations of paragraphs 2 through 10 and 15 through 111 of this Complaint as though set forth in full herein.

113.    Rule 10b-5 promulgated by the Securities Exchange Commission pursuant to Section 10(b) of the Securities Exchange Act of 1934, 28 U.S.C. §78j provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
>
> 1.   To employ any device, scheme or artifice to defraud;
>
> 2.   To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, or
>
> 3.   To engage in any act, practice, or course of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

114.    In connection with the sale of securities to Plaintiffs as described herein, Defendants made, or caused to be made, materially false statements in the POM, as noted above, and they omitted to state, or caused to be omitted, other material facts necessary to make the statements in the POM not misleading under the circumstances in which those statements were made, in as part of soliciting investments in the Company from Plaintiffs.

115.    Defendants made or caused the foregoing false statements and omissions to be made with intent to deceive Plaintiffs, and/or with knowledge of or in reckless disregard of the true facts.

116.    Defendants employed or caused to be employed the internet, telephone and mail to solicit the sale of securities to Plaintiffs under the foregoing circumstances.

117.    Plaintiffs actually relied on the foregoing false statements and omissions in the POM in deciding to purchase securities of the Company.

118.    Plaintiffs were unaware of the fraud perpetrated on them by Defendants until sometime after they learned that the Founding Shareholders had ousted the Company's board of directors on August 21, 2021.

119.    Plaintiffs would not have purchased the Company's securities but for Defendants' false statements and omissions.

120.    As a direct and proximate result of the fraud perpetrated by Defendants, Plaintiffs suffered damages, including loss of their entire investments in the Company or over $1.4 million.

121.    Defendants are jointly and severally liable for the harm they have caused.

## COUNT TWO

### State Securities Fraud Under Florida Law Against
### Defendants Onik,  Hobbs and Gerardi

122.    Plaintiffs set forth the allegations of paragraphs 2 through 10 and 15 through 111 of this Complaint by reference as though set forth in full herein.

123.    Subsection (a) of the Florida Securities and Investor Protection Act, 517.301 provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
>
> 1.    To employ any device, scheme or artifice to defraud;
> 2.    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, or
> 3.    To engage in any act, practice, or course of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

124.     Subsection (2) of Section 517.211 of that Act provides that "Any person … selling a security in violation of § 517.301, and every director, officer, partner or agent of or for the … seller, if the director, officer, partner of agent has personally participated or aided in making the sale … is jointly and severally liable to the person … providing the security from such action for rescission."

125.     In connection with the sales of securities described above, Defendants intentionally, recklessly or at least negligently made, or caused to be made, materially false statements and omissions in the POM as described herein in connection with the sale of securities to Plaintiffs.

126.     Plaintiffs justifiably relied on Defendants' false statements and omissions in the POM in deciding to purchase shares in the Company.

127.     As a result of the false statements and omissions Defendants made, or caused others to make, Plaintiffs suffered damages from the purchase of shares of the Company in August 2018 and June 2019, and from the purchase of debt of the Company in May 2020, including the loss of each of their entire investments in the Company, exceeding $1.4 million.

128.     Plaintiffs continue to own the shares and debt they purchased from the Company.

129.     Plaintiffs shares and notes have been rendered worthless by Defendants' fraud.

130.     Defendants are jointly and severally liable in rescission for the harm they caused.

131.     Plaintiffs are able and willing to tender their shares and debt instruments to Defendants in exchange for the return the money they lent to or invested in the Company, along with interest as allowed by law.

132.     Alternatively, Defendants are jointly and severally liable for compensatory damages to Plaintiffs in the amount of their investments in the Company.

## COUNT THREE
## Fraud Against Onik, Hobbs and Gerardi

133.     Plaintiffs incorporate the allegations of paragraphs 2 through 10 and 15 through 111 of this Complaint by reference as though set forth in full herein.

134.     Defendants intentionally misrepresented, or caused to be misrepresented, to Plaintiffs material facts concerning the investment opportunity in the Company, and omitted to state, or caused to be omitted, other material facts necessary to make what they did say not misleading.  Those misrepresentations include the following false statements, among others:

> a.     That Defendant Onik had achieved significant results treating metastatic end-stage prostate cancer patients using a proprietary radio frequency ablation technique, when in fact he had achieved those results using non-proprietary cryo-ablation or radio frequency processes.

> b.     That Onik had achieved significant results treating metastatic end stage prostate cancer patients using a proprietary drug formulation when in fact he had used generally available prescription drugs invented by others in a formulation previously used by others to treat patients.

> c.     That the Company would employ a proprietary medical methodology developed by Onik, when in at least one other researcher had used the same process before Onik, and had taught the technique to Onik.

135.     Defendants also fraudulently omitted to disclose that the Company had received the warning letter on patent infringement from AngioDynamics in May 2019, or that Onik had told the Board of Directors in June 2019 that cryo ablation was superior to the patented RF-Emb technology the Company had acquired from RFEMB.

136.     Defendants' fraud intended to and did in fact induce Plaintiffs to purchase securities and debt from the Company in reliance on those false statements.

137.     Plaintiffs purchased securities of the Company in reliance on Defendants' misstatements and omissions.

138.     Defendants' fraud caused Plaintiffs damages in excess of $1.4 million.

139.     Defendants' conduct was extreme and outrageous, and merits the imposition of punitive damages in an amount sufficient to punish them for their misconduct and to deter them from engaging in such misconduct in the future.

## COUNT FOUR

### Negligent Misrepresentations and Omissions
### Against Onik, Hobbs, and Gerardi

140.     Plaintiffs incorporate the allegations of paragraphs 2 through 10 and 15 through 111 of this Complaint by reference as though set forth in full herein.

141.     Plaintiffs assert this claim in the alternative to the fraud claim asserted in Count Three.

142.     The representations Defendants made, or caused others to make, in the POM, described above, were false when made.

143.     The false statements and omissions in the POM concerning the Company were material in that reasonable investors would have wanted to know the true facts, and all of the true facts, before investing in the Company.

144.     At the time Defendants made, or caused to be made, the false statements in and material omissions from the POM, they did so under circumstances where they were obligated to exercise due care in their communications with Plaintiffs.

145.    At the time Defendants made or caused to be made the false statements and omissions in the POM, they did so negligently, not knowing or doing due diligence to uncover the true facts.

146.    In making, or causing others to make, false statements and omissions to Plaintiffs in the POM, or causing others to do so, Defendants acted for the purpose of influencing Plaintiffs' investment decisions.

147.    Plaintiffs justifiably relied on Defendants' false statements and omissions in deciding to invest in the Company.

148.    Had Plaintiffs known the true facts, they would not have invested in the Company.

149.    Defendants' misrepresentations caused Plaintiffs to suffer damages in excess of $1.4 million.

## COUNT FIVE

### Conspiracy to Defraud Against Onik, Hobbs and Gerardi

150.    The allegations of paragraphs 2 through 10 and 15 through 111 of this Complaint are incorporated by this reference as though set forth in full herein.

151.    Defendants agreed among themselves to commit the foregoing fraudulent acts in 2018, in 2019 and in 2020 to solicit Plaintiffs to invest in the Company.

152.    Each of the Defendants engaged in at least one overt act in furtherance of the conspiracy, in that each of them prepared and disseminated the POM, or caused the POM to be prepared and disseminated, with false statements and omissions, as noted above.

153.    Each of the Defendants intended that the POM be provided to investors, including Plaintiffs, to persuade them to invest in the Company.

154.    Defendants Hobbs and Gerardi, at the instruction of the other Defendants, disseminated the POM to Plaintiffs to solicit their investment.

155.    Each of the Defendants intended investors, including Plaintiffs, to rely on the POM to make their decisions to invest in the Company.

156.    Each of the Defendants knew that investors, including Plaintiffs, would rely on the POM in making their investment decisions.

157.    Defendants' actions caused Plaintiffs to invest in the Company.

158.    Plaintiffs were damaged in an amount in excess of $1.4 million as a result of the foregoing acts of Defendants.

WHEREFORE, Plaintiffs request the Court grant them the following relief:

A.      Awarding them either recessionary relief or compensatory damages against each of Defendants, jointly and severally, for the damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial but not less than their investments in the Company;

B.      Awarding Plaintiffs punitive damages against each and all of the Defendants, jointly and severally;

C.      Awarding pre- and post-judgment interest on the foregoing sums at the highest rate applicable at law until paid in full;

D.      Awarding Plaintiffs such other and further relief as the Court deems appropriate.

DATED this 7th day of June, 2022.

GREENBERG TRAURIG, LLP
777 South Flagler Drive, Suite 300 East
West Palm Beach, FL 33401
Telephone:  (561) 650-7900
Facsimile:   (561) 655-6222

By: */s/ Bridget Ann Berry*
     Bridget Ann Berry
     Florida Bar No. 515639
     berryb@gtlaw.com
     *Attorneys for Plaintiffs*
